UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

UNITED STATES OF AMERICA,

              Plaintiff,

v.

TIMOTHY MANN,

              Defendant.

Case No. 1:23-mj-00304-RML-1

Brooklyn, New York
March 30, 2023
2:33 p.m.


TRANSCRIPT OF INITIAL APPEARANCE RULE 5(c)(3) HEARING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Matthew C. Skurnik, Esq.<br>U.S. Attorney's Office<br>271 Cadman Plaza East, Ste. 4090<br>Brooklyn, NY 11201 |
| For the Defendant: | Michael P. Padden, Esq.<br>Federal Defenders of New York, Inc.<br>One Pierrepont Plaza, 16th Floor<br>Brooklyn, NY 11201 |
| Also Appearing: | Valeria Lopez, Pre-trial Services |
| Clerk: | S.Y. |
| Court Recorder: | Electronic Sound Recording |
| Transcription Service: | Chris Hwang<br>Abba Reporting<br>PO Box 223282<br>Chantilly, Virginia  20153<br>(518) 302-6772 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

(Call to order at 2:33 p.m.)

THE CLERK:  Cause for arraignment on a removal complaint to the Eastern District of North Carolina, USA v. Timothy Mann.  Case number is 23-304-M.

May I have the parties state their name for the record, appearing for the Government?

MR. SKURNIK:  Good afternoon, Matthew Skurnik for the United States.

THE CLERK:  Thank you.

And appearing for Mr. Mann?

MR. PADDEN:  For Mr. Mann, Michael Padden, Federal Defenders.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Thank you.

MR. PADDEN:  Mr. Mann is present next to me.

THE COURT:  Good afternoon, sir.

THE DEFENDANT:  Good afternoon, sir.

THE COURT:  All right, so Mr. Mann, you're here for -- to be arraigned on a removal complaint.  You have the right to remain silent.  Anything you say here today can be used against you.  Even if you made statements to the Government, you don't have to say anything else.

You have an attorney here to represent you. Obviously his job is to defend you.  You know, anything to say to him is private and confidential.  You can feel free to speak

to him privately at any time during the arraignment.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  First of all, I'm going to swear the Marshal.  Do we have Marshal Jack (phonetic)?

THE MARSHAL:  Here.

THE COURT:  Do you swear or affirm the statements you made in the affidavit are true?

THE MARSHAL:  They are.

THE COURT:  Thank you very much.

(Counsel confers with the Defendant)

THE COURT:  All right, so Mr. Mann, as you probably heard, this is called a removal proceeding because there's a warrant that was issued from the federal court in North Carolina seeking your arrest to appear on charges there.  You have a number of rights here.  The first is the right to an identity hearing.  Did your lawyer explain to you what that means?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right, so that means you have the right to make the Government prove that you are in fact the person who's wanted on that warrant, not that you're guilty, but that you're the person who's wanted.

Mr. Padden, have you explained to your client his rights under the removal process?

MR. PADDEN:  I have, Your Honor.  There's no dispute that he is the person that is mentioned in all the paperwork emanating from North Carolina.

THE COURT:  Okay.  And I take it you both have reviewed the waiver form and both have signed it, correct?

MR. PADDEN:  Yes, sir.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right, so I have you in front of me a waiver of Rule 5 and 5.1 hearings, waiving your right to an identity hearing and production of the warrant.  Okay.

MR. PADDEN:  Although we have the warrant, but we don't need another one.

THE COURT:  I don't think so.  All right, and are you waiving your rights voluntarily?  In other words, is anybody forcing you or threatening you --

THE DEFENDANT:  No.

THE COURT:  -- to make you do it?

THE DEFENDANT:  No, sir.

THE COURT:  It was your decision to waive it?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  All right, so do you understand the charges or would you like me to read them for you?

THE DEFENDANT:  He explained.  I understand.

THE COURT:  Okay.  All right, so what is the Government's position on bail at this point?

MR. SKURNIK:  Your Honor, the Government is seeking a detention hearing that the Defendant would remain in custody until he arrives in North Carolina.

THE COURT:  Okay, and what's the reason for that?

MR. SKURNIK:  So we think the Defendant presents both a serious risk of flight and a serious risk of threatening prospective witnesses.

So the underlying conduct here, the conduct alleged first in the complaint and now in an indictment relates to two counts of cyberstalking that the Defendant became obsessive and threatening to a former friend, sent multiple death threats and other violent messages via text and social media to the friend, the friend's mother, and other family members of the friend.

Just to give the Court an idea, one of the messages for example said go to the kitchen and get a knife and slice your throat before I do it.  It's better to get it done now before I do it.

So despite the serious conduct alleged in the complaint and the indictment, the Defendant was released subject to conditions, including that his computer use be monitored, that he not contact the victim, the victim's family members or close associates, and that he be subject to home detention with location monitoring.

Since then, and this is back in December, since then, the Defendant has repeatedly violated those conditions.  I

think the most concerning for the Government is that he has attempted to contact victims and associates of the victims.

So he set up a -- so he has a phone that he is monitored by Pre-trial Services. And he set up a new Instagram account separate from sort of not monitored on that phone and used it to contact a friend of one of the victims.

When asked about this by Pre-trial Services, my understanding is that he denied it, but he had in his email a sort of reset password for the very account that he used to contact this individual.

THE COURT: Was that an Instagram account?

MR. SKURNIK: Yes, Your Honor.

THE COURT: Okay.

MR. SKURNIK: It also appears, and this is based on evidence that has developed as part of the investigation, that he has repeatedly called one of the victims using a blocked number. So one of the victims has received multiple calls from a blocked number and also voicemails.

Now the Defendant's phone, which is being monitored, didn't reflect those phone calls. However, in the voicemails left on the victim's phone, there you can hear in the background videos played from YouTube. And on the Defendant's monitored phone, those same videos were viewed and accessed at the same -- around the same time that the messages were left to the victim.

So the Government's assumption here is that the Defendant has been using some other phone or device to contact the victims and the victim's associates in this case.

You know, separate and apart from that, the victim has repeatedly violated location monitoring on I think at least 10 different occasions.

Multiple of his office visits with Pre-trial Services have had to be cut short due to the Defendant's behavior. And he has refused to submit certain documentation to Pre-trial Services.

So, in the Government's view, this is a serious breach of trust of the Court's trust. You know, we don't see any sort of additional conditions that could be placed to ensure that the Defendant does not present a threat to a risk of threatening prospective witnesses in this case and a threat to the community and to ensure his appearance.

THE COURT: Thank you.

Mr. Padden?

MR. PADDEN: Well, Judge, as you as you might imagine there's another side to the story here.

THE COURT: Uh-huh.

MR. PADDEN: I'll start where the Government began with the alleged recent contact that may -- that suggested he has had with not the victim here, but a friend of the victim. And I understand the crux of the issue would be more about

using another phone, but still, the victim -- I spent a lot of time speaking with Mr. Mann's attorney, the federal defender in North Carolina, as well as Ben Yaster, who represented him in the initial proceedings before I think it was Judge Busara, who released him on the bond that he's currently on, a bond which was affirmed or reinstituted in North Carolina by the magistrate judge, whom he appeared before on the date that he was scheduled to appear in North Carolina when released previously by Judge Bulsara.

In fact, I think if you read the complaint, the indictment was voted one day and he appeared the following day. Before I get to more points with regard to why, this is one of those cases, Judge, that if you were to release Mr. Mann on his current bail conditions, he'd be in court in North Carolina tomorrow.

THE DEFENDANT:  Tonight, sorry.

MR. PADDEN:  Tonight, he says.  If, you know, the Court said, well, it'll be a month or so before he goes through the various machinations that the Bureau of Prisons will him through to get him there.

He has no fear or no reason not to go to court in North Carolina.  He denies generally most of the allegations here, more the business about the monitoring and the timing and all of that, is more a matter of him not being able to get where he wanted to go within the time frame he was given by

Pre-trial Services.

I'm not trying to excuse that or anything, but it's not like he disappeared.  They always knew where he was.  He's on electronic monitoring.

The more serious concern, I would think, by all would be the contact that he's alleged to have with the so-called victims in this case.

He adamantly denies that, Judge.  And in fact it's been, from his point of view, the -- actually the opposite.  They have been reaching out to him by email and various ways of communication.

And in fact, the lawyer, the federal defender in North Carolina, presented to the prosecutors in North Carolina recently evidence of them, their so-called victims, trying to contact him, basically asking him for money and threatening him.

So this is going to have to be fought out in the court of law no doubt.  But as far as concern about risk of flight, I don't think there's any of that.

Whether he's a danger to the community, I think it's an open question, Judge, as to what's really going on here and who's more to blame for the situation.

As the Government said, the so-called victim in this case was a friend.  They had a relationship and obviously it went sour and it got contentious.

And from what I gather, Judge, a lot of things went both ways in terms of the communications with each other and the situation in North Carolina.

Obviously, that's going to get resolved here. Obviously, the case is ongoing in North Carolina. The lawyer there is actively involved in communication with the prosecutor there.

I know Mr. Yaster in my office had quite a bit of contact with Mr. Mann when he was released back in December. Bottom line, Judge, they know where he lives. He's on electronic monitoring. He denies the allegations of any sort of untoward contact with the victims and in fact claims that he himself is the victim there.

As he keeps telling me, I'll go to North Carolina tonight if they want me to. I'll go down there and deal with this. He's got very strong feelings.

And I think his personality may have not put him in the best light with Pre-trial Services. I -- you know, I certainly respect and know what a good job they do, but I think that Mr. Mann is a bit of a volatile character and I can imagine that some of the conversations were not as polite as I would have advised him to be.

But -- and we apologize for that, but the bottom line here is he a risk of flight? No. Will he go to North Carolina on direction? Absolutely. And has he done anything to further

suggestions that he was in any way perpetrating any sort of further threats to the alleged victims in this case? Absolutely not.  There's no evidence of that, Judge.

In fact, there's evidence to the contrary that they were reaching out to him, threatening and demanding money from him.  So it's going to be an interesting case, Judge.

Unfortunately, it's going to be in North Carolina, but I don't think there's any reason to change the bail conditions other than perhaps admonish him to be a little more polite when he's dealing with Pre-trial Services, to listen to what they tell him to, to try to conform to their permission as awaiting trial to the absolute letter of their permission.

But other than that, Judge, I don't see a reason, sufficient reason, to change his bail conditions at this point.

THE COURT:  Were any of the communications allegedly by email, the ones that we're worried about?

MR. PADDEN:  Not -- the ones to you.

THE DEFENDANT:  Yeah, to me.

MR. PADDEN:  To him apparently.

THE DEFENDANT:  And Facebook Messaging.

MR. PADDEN:  And Facebook Messaging.

THE COURT:  Does anyone have copies of those to try to get to the bottom of who's telling the truth here?

MR. PADDEN:  Yeah, Judge, I just I spoke to the lawyer and he said he had sent them to the prosecutor.  I don't

have them, no.

THE DEFENDANT:  The prosecutor submitted phone numbers.

MR. PADDEN:  Yeah, okay.

THE COURT:  So Mr. Mann's lawyer from North Carolina got ahold of some of the copies of emails from the people who are allegedly the victims or relatives of -- and friends of the victim, gave them to the prosecutor?

MR. PADDEN:  That's my understanding.

THE COURT:  And we don't have a copy of them?

MR. PADDEN:  No.

THE COURT:  Okay.  Does the Government have any information to shed light on this?

MR. SKURNIK:  Your Honor, I don't have any further information about I guess communications from the victims or victim's family to Mr. Mann.

I have been in contact with the Assistant U.S. Attorney down in North Carolina, but you know, I don't have any information about that.

I would just say had, Your Honor, the purpose of release with conditions is that the Defendant has to comply with those conditions.

THE COURT:  Yeah.

MR. SKURNIK:  And I really don't see anything over the last four or five months since the conditions were

originally imposed that would indicate that Mr. Mann would continue to comply with his conditions of pre-trial release.

THE COURT:  Uh-huh.  So regardless of what those emails say, you're relying independently on the fact that the obligation to report to Pre-trial Services when he was leaving the house was not adhered to essentially?

MR. SKURNIK:  Yeah, that's right, Your Honor, as well as the fact that, you know, even if there were emails say sent from victim or victim's families or associates, Mr. Mann is still under the obligation to comply with his conditions of release, which includes himself not contacting the victim, or family, or associates.

So, that doesn't explain, for example, 14 phone calls with multiple voicemails left to one of the victims.  So, you know, I don't think it explains the Defendant's violations of pre-trial release.  And I think detention here is warranted.

THE COURT:  Do we know what the voice messages said?

MR. SKURNIK:  So I have not listened to them myself, but my understanding, Your Honor, and this is based on communications with the AUSA in North Carolina is that the voicemails contained like recordings from the Internet from like YouTube.

And those same recordings were accessed on the Defendant's phone.  And that was discovered by the monitoring that Pre-Trial Services has of its phone.

THE COURT:  Uh-huh.  So the violation that you know of is that he contacted the victim?  And you know that because of the simultaneous use of the YouTube or appearance of the YouTube recordings or whatever they were?  You don't know the content of what was said.  Was anything said in those --

MR. SKURNIK:  Yeah, so --

THE COURT:  -- messages?

MR. SKURNIK:  -- my under -- I believe -- I actually don't know whether anything was said.  My understanding is that nothing was said, but I would have to confirm that, Your Honor.  I will say in addition to those phone calls, there's also the new Instagram account that had contacted one of the friends of the victims.

THE COURT:  And did that -- was there any content in that account?

MR. SKURNIK:  Again, I don't know the details of that contact, Your Honor.

THE COURT:  Okay.

MR. SKURNIK:  I just know that a reset password for the same -- a reset password email arrived on the Defendant's monitored phone for the same Instagram account that had contacted the victim's friend.

MR. PADDEN:  Again, Judge, friend, not victim.

MR. SKURNIK:  Well, victim's close --

THE COURT:  I think the victim, relatives, and

friends were included in the prohibition, weren't they?

MR. SKURNIK:  That's right, Your Honor, close associates of the victim.

THE COURT:  What can Pre-trial Services tell me about what happened?

MS. LOPEZ:  Yes, Your Honor.  In regards to the Instagram account, I was provided information that there was some contact with the Defendant and one of the friends of the victims.

I did check his monitored device and I found an email from Instagram with a recent password of the same account.  Around the same time that the contact was made, I checked the Instagram account.  Initially, there were no photos.  And then, after a few days, there were photos of the Defendant on it.

I had him report to the office so he can discuss the access of Instagram that's not being shown on the monitored phone.  And he informed that the account was deleted and it was deleted months ago.

But when I went to go check, it was then de-activated.  So, again, I'm not sure if the Defendant is using another device to access different social media apps.

Additionally, there were messages from WhatsApp and Telegram, which included verification codes.  And both apps are not downloaded on the device that he's being monitored on.

THE COURT:  Was that a violation of his terms of

Supervised Release?

MS. LOPEZ:  Yeah, when we receive a verification code, it's directly for that phone number on the device.

THE COURT:  Uh-huh.

MS. LOPEZ:  So if the app -- you can use the application on a website.  It has to be an application downloaded on the phone.  If it's not downloaded on the phone, it has to be somewhere downloaded.

THE COURT:  It has to be as a condition of his release?

MS. LOPEZ:  Yeah, it -- to -- okay, so when you receive a verification code --

THE COURT:  Right.

MS. LOPEZ:  -- from the apps, it's specific to those applications being downloaded as an application on the phone, not a website.

THE COURT:  Right.

MS. LOPEZ:  And both applications were not downloaded or were not seen.  I never found them on his monitored phone.  Therefore, it just suggests that it's being accessed through a different phone.

THE COURT:  Uh-huh, so in other words, in order to avoid supervision, another phone was used.  And the proof of that is that you've got the push or the access number --

MS. LOPEZ:  Correct.

THE COURT:  -- the access code that demonstrates that?

MS. LOPEZ:  Correct.

THE COURT:  Okay.  And tell me about the location monitoring issues and the compliance here.

MS. LOPEZ:  Yes, Your Honor.  We've had multiple instances almost on a daily basis between March 2nd through March 9th, where the Defendant was leaving in the morning.  And in the afternoon, it appeared that he was located at a deli.

When I addressed it during the same office visit, he denied it.  Just recently, my co-workers conducted a home visit and he did admit that he was going to the deli because he didn't have any food, but that wasn't communicated with us for us to be able to adjust that schedule for him.

We've provided schedules for him to attend job interviews.  He has made unauthorized stops at McDonalds, Chase Bank when those are things that he can just communicate with Pre-trial Services and we'll give him the schedules for, but since he didn't, those are unauthorized stops and unauthorized leaves.

THE COURT:  So is your concern that he's a risk of flight or that he just is dangerous to or at least not complying with respect to victim witness, friends?

MS. LOPEZ:  Your Honor, we believe that it's more so of the not complying with the conditions and the behavior

towards Pre-trial Services Office and our staff.

THE COURT:  And how would you describe the behavior towards your staff?

MS. LOPEZ:  Combative.

THE COURT:  And what exactly happened?

MS. LOPEZ:  Well, I'll be in a room with him addressing the noncompliance and the Defendant will start, you know, saying are you accusing me, are you interrogating me, I don't want to speak to you, I want to speak to my attorney because it seems like you're accusing me.

He's called us multiple times within an hour if we don't respond back to him.  He's emailed us paragraphs' worth of just a lot of information saying that we're -- I can't even tell you the content just because there's so much.  He'll send us so many emails in one hour.  And on the phone, he's also combative.  That's basically what it is.

THE COURT:  Uh-huh.  All right, can -- are you describing someone who's just very difficult or someone who you think is dangerous?

MS. LOPEZ:  Difficult, but during my interactions with him, I've had to cut the conversation and have him leave our office just to not further escalate the situation.

THE COURT:  Uh-huh, okay.  And if he were to remain on supervision, are you saying that you think he's not -- it's not possible to supervise him the way he's been behaving

recently?

MS. LOPEZ:  Your Honor, if you release him on the same conditions, he will continue -- it will seem like he will continue violating the conditions that he's already on.

And you know, we've had multiple conversations about, you know, how we explained the conditions and how to request certain things.  And it just seems like the Defendant just doesn't -- just won't comply.

THE COURT:  Uh-huh.

MS. LOPEZ:  And it's with different staff as well, because I wasn't his first officer.  He had another officer.

THE COURT:  Okay, thank you.

MR. PADDEN:  Judge, you've probably seen me try to shut him up about 10 times during your -- so I can listen to your conversation.  That's how he is.  And I'm not trying to excuse it.

THE COURT:  Yeah.

MR. PADDEN:  I have great -- you know I have great respect for Pre-trial and their efforts, but he is a very hyperactive person vocally.

I interviewed him downstairs in the pens.  He's jabbering in my ear through this entire proceeding here making it sometimes difficult to listen to you.  He's a very hyperactive person.  He's very excited about the situation.  I don't mean in a positive way.  I mean that in a pleasant way,

just in a, you know, a concerned way.

He feels he's been wronged here by -- and the situation involving the other parties in this case is -- there's another side to be heard to that.  And he's very anxious to get his version out.

Mr. Yaster told me that he had spent hours on the phone with him subsequent to his representation of him in the removal proceedings.  The lawyer in North Carolina says he's on the phone with him all the time.

He's a needy person.  He is a excited person.  He's not a dangerous person.  I mean, we've actually decided in the Court in North Carolina as to whether or not there was any real danger between either side of the equation in that relationship, but he's not a danger to anyone else.

He might not be the most polite.  And I appreciate Pre-trial characterizing it as combative.  I don't think that's combative, invoking one's right to talk to his attorney.  You know, maybe if I was on the other side, I'd think it was combative, but it's not.  He's just vocal.  He's just animated.  He's just excited.

And I certainly will warn him that that's not the way he should be treating the people that work for the Court, that are basically looking out for his interests as well.

He's hard to control, Judge, in that vocal sense.  But his transgressions with regard to the monitoring, he went

to the bank, he went to the deli on his way to wherever he was going.

He's lost three jobs, because he kept showing up late because he couldn't get there in the time frame that was given to him to travel, but he keeps going back and getting a new job.

He's worked at -- remind me?

THE DEFENDANT:  First it was Walgreens.

MR. PADDEN:  Walgreens.

THE DEFENDANT:  Then it was Shake Shack.

MR. PADDEN:  Shake Shack.

THE DEFENDANT:  Dollar General, I just lost --

MR. PADDEN:  Dollar General, he lost because of this. You know, when he was told to come down and bring his phone in a day or so ago, he came down and turned his phone over.  He may be difficult, Judge, but he's not a flight risk.  And I don't think he's a danger to the community.

THE COURT:  Well, the underlying charges are serious.

MR. PADDEN:  Yeah.

THE COURT:  And so, the question really is if he can't follow the terms of supervision in a serious case, what does the Court do about that?

MR. PADDEN:  Well, Judge, I think he is following them.  Maybe not to the higher expectations of Pre-trial Services or maybe not even Your Honor, but the best of his

ability, he's following them.  He's trying to.

And I would only suggest that you admonish him that, you know, he's an on shorter leash than he may have thought he was on at this point.

He's got a case to deal with in North Carolina.  He's going to deal with that.  And he's having a rough go because, you know, he's losing jobs that he thinks are because he's not given enough time to travel.  Maybe we can adjust that little bit.

You know, I'm certainly willing to negotiate or intercede on his behalf with Pre-trial.  I don't think they'll find me combative, but or maybe Valeria will, but Judge, I think this can be worked out.

I don't think incarcerating him and putting through -- him through a month or two travel around the country to get to court in North Carolina, which he knows his court date.  He showed up at the last time immediately.

He's anxious to go down there and have this -- his side of the story heard.  I don't see justification for putting him in prison right now.

THE COURT:  And what's the -- what concerns me the most is the contacting friend of the victims.  What is the strongest evidence you have that that in fact did happen?

MR. SKURNIK:  So, Your Honor, there's I think two sets of evidence here.  So the first is -- so two events.

There's the Instagram account and then the phone calls.

And on the Instagram account, I think it's pretty convincing evidence that the Defendant received on his monitored phone a reset password for the very account that had been contacting the friend of one of the victims.  And that same account as we just heard from Pre-trial Services later had pictures of the Defendant posted on it.

So I think that's pretty compelling evidence that the Defendant using some other device contacted one of the victim's friends.

And then, 14 or so phone calls from a blocked number to one of the victims and in voicemails left from those phone calls, the same recording that had been accessed on the Defendant's monitored phone during the exact same time frame.

So I think in both instances, we have fairly compelling evidence that the Defendant is skirting his conditions of release to contact both the victims and one of -- a friend of one of the victims.

And you know, in the Government's view, that presents a risk of a number -- it's a risk to the community.  It's potentially witness intimidation in the case.  It certainly doesn't comply with the conditions of pre-trial release.

And so, we don't think it makes sense for the Defendant to remain under the same conditions out on pre-trial release again.

THE COURT:  Are there any more stringent conditions that could be imposed?

MR. PADDEN:  Judge, I don't know, can you talk into the mic?

THE COURT:  I'm talking to --

MR. PADDEN:  There's something I just thought of that --

MS. LOPEZ:  Your Honor, the most restrictive condition would be home incarceration, but I do want to inform the Court that, you know, the Defendant does not live with any relatives.

He has told me that he doesn't have friends or family around.  So that would be hard for him to live by himself and be able to do all the necessities he would need while on home incarceration.

THE COURT:  Uh-huh.

MS. LOPEZ:  It wouldn't allow for employment either. And as far as cell phone, if we order -- if Your Honor orders no use of any Internet-accessible devices, he would be able to use a flip phone.

But that's -- I mean, again, Your Honor, from the violations, it appears that the Defendant is using another device.  So there are no more stricter conditions that we can put the Defendant on.

THE COURT:  Uh-huh, right.

Mr. Padden?

MR. PADDEN:  Yeah, I was just thinking, Judge, and I don't know that this has really been addressed, but certainly in my limited experience with him today and communicating with him, you know, I think he probably needs someone more equipped than I am to communicate with in terms of his issues of stress and anxiety, perhaps some mental health counseling or meetings with either -- whether it be New York forensics or whoever Pre-trial is in a position to refer him to, maybe that would help.

Maybe just the frustration of the charges over his head, it's -- and his sort of generally agitated state that perhaps some counseling or at least speaking to someone that he could address his anxiety with might actually go a ways towards combatting all concerns here.

THE COURT:  Well, anything else from Pre-trial Services?

MS. LOPEZ:  No, Your Honor.

THE COURT:  Anything else from the Government?

MR. SKURNIK:  No, Your Honor.

THE COURT:  All right, well, this is a difficult situation because it sounds to me as though it's fairly clear that you haven't been following the conditions of pre-trial release that you should have.

And that's concerning because it means that you're

having difficulty following court orders.  I can see that you seem frustrated and I can see that you feel pretty strongly about this.

The tools that the Court has are more -- they're not as refined as they should be to try to deal with this situation.

And part of the problem is that you're not in North Carolina now.  I think if you're in North Carolina, it would be a lot easier, but I'm concerned that it appears that you've violated two sets of conditions.

One is just that you have to make your location known to Pre-trial Services at all times and you didn't do that.  And it wasn't just once, but it was many times.

And when Pre-trial Services tried to get you to correct that behavior, you weren't able to do it.  You know, whether it's because you didn't want to or you just weren't able to, I'm not -- it's not possible to determine that here.

But what's more concerning is that it appears that despite the fact that you got a pretty charge serious against you, which obviously you're contesting and you say isn't correct, but serious the kind of threat that the Government has mentioned is a serious threat.

And the condition of your release included that you not contact the victim or any friends or relatives of the victim.

So I have to accept the Government's proffer, which is that, in fact, you did contact a friend of the victim. You sent -- you posted photographs and whatever else. And to me, that's a serious violation of your condition of release.

So I -- and I wish there were a way to get you to North Carolina immediately, rather than, you know, having to wait 10 days or whatever it's going to be. But I think because of the nature of the successive violations of pre-trial release, that detention unfortunately is what's required here.

When you get down to North Carolina, if you can put into place a program that might deal with all the issues that you've had here, it might make more sense, but we can't do that from here.

THE DEFENDANT: Can I say something to the judge?

MR. PADDEN: You can. I don't advise it. I think I've said everything that needed to be said.

THE DEFENDANT: You missed a point. The Instagram account that he's talking about was deleted. She -- Ms. Lopez asked me to come to her office and questioned me about why do you have something in your email about a reset password or something like that? I said what's the date on it? She didn't give me the date.

I explained to her that my Instagram account was deleted and that the alleged victims that the Government's going so hard for to prove that they're victims, Derek

(phonetic) was still contacting me, saying send $3,000 via cash app to this cash app tag and all of this can go away, trying to extort me.

The mother even messaged me on Instagram and it was instructed by my -- which I screen-shotted at and sent to my lawyer.

And it was instructed by my lawyer I think that's enough to have. He told me, this was his exact words, if you feel as though that you can't -- if you let them keep sending you messages so it could build up, that way, I'm able to talk to you on your behalf to the prosecutors to see if we can dismiss this or drop this case down to a misdemeanor, but if you feel like you cannot control your emotions and not respond, I would advise you to delete it.

So when I tried to delete -- for some reason, I had logged out of the Instagram account. And then, when I tried to log back in, I don't remember the -- I didn't remember the password.

So I was not aware of that I was not supposed to be on social media or whatever the case may be because that was never told to me. So when I tried to log back into the account, I had to reset the password. That's why the email was there.

And then, when I logged back in, I deleted it. And I explained that to Ms. Lopez and Ms. Lopez said it's -- she was

accusing me that the Instagram account Timtoosharp was still active.

And I said no, it's not.  It's deleted.  She says, well, why do I just look at it a couple days ago or don't want to quote her verbatim, but something along the lines she said and it was active.

I said, okay, well, go ahead and look to see if it's still active.  And it's deleted.  And it's not like I can show her if the account is still active because after 30 days, the Instagram account is deleted so when you try to go back -- Instagram gives -- Instagram, the app, gives you a 30 day gap, a window to be able to reactivate your account if you deleted it by signing in.

Once those 30 days pass, Judge, you cannot get back into the Instagram account.  So when I was in front of her like to try it prove that, I was not able to do that, because those 30 days passed.

And the reason why I'm so animated and I guess you could say frustrated and disappointed is because I feel like there is more serious crimes out here that the FBI could be going after, but they choose to go after me.

I've never been charged before a day in my life. Never been in trouble with the law.  And here I am facing five count.

Now I'm not saying I'm innocent because I have

admitted on record that I did go back and forth with these people before the charges were called that I -- brought on me, but they're the ones that were threatening me.

And so, it's two sides to every story.  And going back to what I was saying, it just seems as though like how I feel that Pre-trial has been out to get me from day one from Officer Burzak (phonetic).

Ms. Lopez mentioned something about that she did give me approval to go to the store, because recently there was a fire in my building.  Two people died because of a gas leak in the building.

So the management in my building where I live at in my apartment took all the stoves out of the refrigerator (sic).  Burzak told me word of mouth that I would be allowed to go to the corner store and that he'll -- and I would get an email.

I never got the email because he came to my -- because I explained to him the situation that I didn't have a stove or nothing and I would have to go out and get something to eat.

And there's a corner store right by my house.  And so then, like I want to say maybe a week later, him and another pre-trial officer came to my house.  And they actually saw it for themselves.

And I said to him in front of the other officer, I said I never got the email.  And then other officer I was

talking to, I don't know her name, that's why I say the officer, she was like don't worry about it, Tim, I'm going to call Ms. Lopez and let her know what's going on and issue you an email today allowing you to give you permission to go and, you know, and go to the corner store, and you know, and get food.  And I got the email that same day.

Going off of the -- because I only know of two incidences where I did not submit documentation when I was allowed to go out.  There were two instances where I have been very stressed out because I feel like when I'm -- a felony on my record is going to hurt my life.  Can't get no job.  Can't do nothing.  It's going to ruin me.

And so, of course, if I know something is not true, I'm going to be animated and feel that I'm being done wrong, because it's not right.

And especially that these people are claiming they're victims, but while a federal case is going on, they're still contacting me, threatening me.  But on top of that, they're not telling the whole truth about the whole context of this whole situation.

Going back to the hospital thing, there were two times that I did not submit documentation, but I have ankle monitor on.

And I emailed the electronic unit those two times that I went out and said, hey, I'm not feeling well.  I feel

like I need to go to the hospital, I'm going to go.  I was not -- I couldn't breathe.

So as I was going to the hospital, I was waiting for the M-35 bus.  The bus never came.  I can't make the bus come.  I can't make it come faster if it doesn't show up.

And then with me losing all these jobs due to pre-trial release supervision, not giving me enough time to make it to work, which caused me to be late several times to all the jobs that I got, I got fired.  So I don't have a job.  I don't have no income.

How can I order a Lyft from the bus stop to the gas -- to the hospital because she had mentioned it to me, well, if you were waiting outside for 40 minutes, why didn't you take a Lyft or Uber from the bus station to the hospital?

I said I don't have no money to do that.  I lost already two jobs because of you not approving my schedule in time for me to go.

So it's not so much that I disrespect the -- I have no respect for the law or that I don't -- I'm not like "F" them or whatever.  That's not the case.

The problem comes in is that they don't approve my schedule on time for me to get to work or they're not giving me enough time to get to work.  They say, oh, I'm not doing that.

THE COURT:  Okay, I understand what you're saying.

THE DEFENDANT:  Yeah, that's the situation.

THE COURT:  But if you can show me some evidence that you were extorted, that someone was trying to shake you down for money, then I would understand that there was a communication that came first from someone else.

MR. PADDEN:  Well, Judge, I can reach out if you want to second call this, I can see if I can get the attorney that represents him in there to send me those.

THE COURT:  Have you seen them?  Are you -- do you know?

MR. PADDEN:  I haven't seen them.  I've only heard them described to me.

THE COURT:  The -- it sounds as though --

(Counsel confers with the Defendant)

THE COURT:  The Defendant is saying that the communications were initiated by the friends of the victim for the purpose of shaking him down for money.

MR. SKURNIK:  So, Your Honor, I don't have any information about that.  You know, I hadn't heard about it before today's proceeding.

That said, I don't think that even if that were true, I don't think that explains necessarily the Defendant's communications over Instagram or multiple 14 or so phone calls from a blocked number.

So look, again, you know, sort of pinch hitting on this case --

THE COURT:  Right.

MR. SKURNIK:  -- coming in just today for the removal proceeding, you know, this is being run out of North Carolina, but you know, I don't think that explains the situation.

And again, if it was one or two or three violations of conditions of Supervised Release, I think some of these explanations, you know, may be credible, but it's over and over again.

So I don't think it would be appropriate to either set this over for another proceeding at this time.  And I think sort of where Your Honor was initially heading with detention is the right way to proceed.

THE COURT:  Uh-huh.

THE DEFENDANT:  Your Honor, may I say something else also?  I just want to point out to you as well is that one of the emails I got from Victim 1 in this case, that the prosecutors are going so hard for, just recently, Quatedra Harris (phonetic) is her name, I got an email from her.  And I'm going to put it out on blast.  I was born with HIV, because my mother was on drugs and that's how I got it.

The lady emailed me and said all types of nasty stuff.  Oh, I hope you die.  You better hope -- just a whole bunch of stuff.  I don't care.  Send it to the probation officer.  I'm going to have the best way to deal with you is to kill you.

And only the reason -- the reason why she was saying that was because recently, while this case was going on, I received a text message from Victim 1, the mother, threatening me, calling me out my name, calling me an HIV crack baby. That's why my biological mother was on drugs. I did not respond. I screen-shotted it, sent to my lawyer.

Mr. David Venable (phonetic), who's my lawyer in North Carolina, Your Honor, said Tim, do not respond. Just block the number. I'm going to send this over to Jake (phonetic), who's the prosecutor on this case in Eastern District of North Carolina.

And I don't know if subpoenas have been issued, but from what I was gathered, Jake wanted to just -- he's know that's her number, because even on the discovery that I got, that when you read the reports, it shows her number, 919, and I'm not going to say the number, but it has her number on there.

And Jake said -- well, I told Jake, you know, what's going on you know that she text me from this number. She's even emailed me just recently. And I forwarded those emails that I got from Quatedra Harris to the Pre-trial along with Ms. Kristen (phonetic), my mitigation specialist, as well as David Venable.

THE COURT: All right. All right, so here's what I'm going to do. I'm going to do -- I'm going to give you an

opportunity to show that you were a victim here or at least they that tried to communicate with you first.

However, I'm -- my order is to detain you. And if you want me to reconsider, you can submit that information to Mr. Padden if you get it and I'll review it.

MR. PADDEN: Judge, as you were speaking, I emailed the attorney in North Carolina and asked him if he could send me those emails. We may be able to address that this afternoon if you just give us perhaps a second call.

THE COURT: Yeah, well, basically, you can come back whenever you're ready for reconsideration of this.

MR. PADDEN: Okay.

THE COURT: So my order is detention based on the numerous violations.

MR. PADDEN: No, I understand.

THE COURT: But if you can show that it -- that there was blame on the other side, it doesn't necessarily excuse you fully, but it means that I might find another way to get you to North Carolina without detaining you for a long period of time.

THE DEFENDANT: All right.

MR. PADDEN: All I'm saying, Judge, is that I may be able to do that --

THE COURT: I'm here.

MR. PADDEN: -- while Court's in session so we can all just be available. I'm sorry.

THE DEFENDANT:  And I appreciate you, Judge, for hearing me out, sir.

THE COURT:  Okay.

(Recess taken at 3:15 p.m., recommencing at 4:18 p.m.)

THE CLERK:  All righty.  All right, we're back on the record second call, USA v. Timothy Mann.

Counsel, again for the record?

MR. SKURNIK:  This is Matthew Skurnik for the United States.  Thank you.

MR. PADDEN:  For Mr. Mann, Michael Padden, Federal Defenders.

THE COURT:  All right, I've been handed some materials from the Defense.

Mr. Padden, would you like to explain what you --

MR. PADDEN:  Sure.  Basically, these are the emails that were sent to the Government to the Prosecutor in North Carolina by Mr. Skurnik (indiscernible) -- Mr. Mann, excuse me, attorney in North Carolina.

They -- as I understand it, I'm sure the Government can speak for themself, but we've been discussing it.  I know that he's spoken to the prosecutor there.  And that there's some investigation going on, but what I can do, if I can just -- there's not much content to them.

THE COURT:  Yeah.

MR. PADDEN:  (Indiscernible) where it is.

THE COURT:  Right.

MR. PADDEN:  But Quatedra Harris is the mother, I believe, of one of the alleged victims.  And that's the person who sent those emails at the beginning.  And then, there is I guess or is this Facebook?

THE DEFENDANT:  Yeah.

MR. PADDEN:  Facebook exchanges with a person named Derek.  That is the actual former I guess you'd say friend of the person with whom Mr. Mann had the relationship with.

So that is -- his name is Derek.  And I think it's all been -- I know that in the indictment and the paperwork, their names are referred to as Victim 1 and 2, but I believe their names are public now.

THE COURT:  So Derek is the one who was allegedly threatened in the underlying --

MR. PADDEN:  Yes.

THE COURT:  -- charging instrument?

MR. PADDEN:  He's the friend that --

THE COURT:  Right.

MR. PADDEN:  -- the other person is that guy's involvement.  Those are the two people that -- and Quatedra Harris is the mother is my understanding.

So, I mean, as you can see for yourself, I mean, it does -- look, I'm not, you know, again, I'm not here to figure out what's --

THE COURT:  Right.

MR. PADDEN:  -- going on down there, but and I'm sure they will, but --

THE COURT:  It's more complicated than it seemed?

MR. PADDEN:  Yeah, it's more to it and as I said earlier, there's more to it than meets the eye.  There is another side to it.

And I think this does support at least my argument that there may have been inappropriate messages coming the other way --

THE DEFENDANT:  Yeah.

MR. PADDEN:  -- towards my client, rather than just towards the so-called victims.  So there's a lot -- it should be an interesting trial, but I think there's not enough based on what we have now to support remanding (indiscernible) this.

But go to North Carolina and appear down there, if they think differently, I guess they'll make that decision, but he's gone there once on the (indiscernible) bail conditions and he's got a court date coming up.  They want him --

THE COURT:  When is his court date?

MR. PADDEN:  Court date is April 25th is the actual court date.

THE COURT:  Is there any way we could advance that?

MR. SKURNIK:  The Court date in North Carolina, Your Honor?

THE COURT:  Right.  Probably not.

MR. SKURNIK:  I'm not -- I don't know.

THE COURT:  Yeah.

MR. PADDEN:  I mean, certainly, if it were here --

THE COURT:  Right.

MR. PADDEN:  -- he's -- that's why you're asking this.  Yeah, that can certainly be advance-able I'm sure.

THE COURT:  All right, so there are a number of things that are clear to me.  First of all, Pre-trial Services has had a hard job supervising you.  And it shouldn't have had a hard job.

These -- your conditions were simple and they should have been followed.  And there were reasons why there were entered.  And you know, a couple judges entered them, so I want Pre-trial Services to be respected for what they do.

And if you are released with -- and the only way you'd be released would be with more stringent conditions, you would have to follow them.  And there would be no question if you violate any of those conditions, that's it.  There's not a second chance or third chance is what it would be.

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay, secondly, I think there's -- I mean, I don't have any doubt that there were violations that you didn't do everything you were supposed to do.  You know, two kinds of violations.

One not being where you supposed to do, when you were supposed to be there and announcing.  I know you have a reason for it, but it's still a violation.

And you know, you can explain it afterwards and it may mitigate the damage, but it's really important that you do everything you're supposed to.

The third is with contact with a friend or the victim.  And the question really is what happened with the blocked phone calls?  Why were there so many blocked phone calls and what came through?  And were you using another phone?  It appears that you might well have been using another phone that avoided the blocking.  So that concerns me.

What is the remedy for all of this?  I don't think that you need to be remanded for that.  So I'm not going to put you in prison for that, waiting for your date, but I'm going to put you on very strict home release.

And we're going to try to come up with something that's going to work and that will not give Pre-trial Services nightmares trying to figure out where you are and why you're not doing what you're doing.

And a lot of that has to do with something, which may not be easy for you to do, which is when you feel frustrated and stressed, it sounds as though you react.

And what you're going to need to do is resist the impulses.  That's the first thing you have to do is learn how

to resist impulses.

And if you can do that, you won't have any trouble with Pre-trial Services.  They'll be more than happy to see you do well.  You know, they're not here to wish that you're not doing well.  They want you to do well.  And to do that, you have to cooperate.

THE DEFENDANT:  Yes, sir.

THE COURT:  And so, I'm giving you this opportunity to do that, but with the recognition that, you know, you didn't follow through the way you could have before, but that I think you can in the future.  Okay, so --

THE DEFENDANT:  I apologize for this.  I was not trying to be intentionally disrespectful.  And I understand the Court's position of why everybody is here.  Ms. Lopez, not the Government and (indiscernible) moving forward that he is where he is.

As far as my impulses, it's because I'm excited about this case.  And I feel like what's being done is wrong.  That's why I had an opportunity spoken in Court, but at times when things are being brought to me like she was asking me about the emails and Instagram, I know I didn't do nothing, but I'm just trying to prove my case, but I was a little excited and animated and how that come off and disrespectful to her and combative.

So, moving forward, you know, I'm going to do my best

and just move forward, not be impulsive and just answer any questions that she asks me.

And if there's an issue, then I just bring it to my lawyer. I'm not going to like -- because in her eyes she indicated it's going back and forth, but me, I am not. And at the end of the day, I need to do what they tell me to do.

THE COURT: Right, just from Pre-trial Services perspective --

MR. PADDEN: Right.

THE COURT: -- that you're being judged, not from yours.

MR. SKURNIK: Your Honor, can the Government be heard?

THE COURT: Yeah, absolutely.

MR. SKURNIK: So a couple things, Your Honor. So the first point is that these messages that the Defendant has now submitted to the Court, first of all, none of these messages to my understanding were identified on the phone that the Defendant was supposed to be using and that were -- that was monitored by Pre-trial Services. So I think this is pretty conclusive that it shows that the Defendant was using another device.

THE COURT: Uh-huh.

MR. PADDEN: So that's the first point.

The second point is that this is not the entirety of

the messages that the Defendant's counsel has submitted to the prosecution team down in North Carolina.  I spoke to the AUSA earlier and there's another set of messages that they provided to that prosecution team.

And they of course have taken it seriously.  They are investigating the messages, but they had an initial concern because in the separate set of messages, which were not provided to the Court today, but were provided to the prosecution team on January 13th --

THE COURT:  January 13th?

MR. SKURNIK:  On January 13th.

THE COURT:  Okay.

MR. SKURNIK:  So, I mean, these messages are from March from --

THE COURT:  Right.

MR. SKURNIK:  -- several days ago, but there's a separate set from January 13th.  And on an initial review, those messages were social media messages, but the name of one of the accounts supposed to be the account of the victim was spelled incorrectly.  There was an extra "T" at the end of the account.

THE COURT:  Uh-huh.

MR. SKURNIK:  And so, that raised a big flag for the prosecution team as to whether those messages were true and accurate.

Now, again, there's an ongoing investigation into the messages, but it I think raised serious concerns for the prosecution team just to start with.  So I just want to make sure, you know, the Court had a, I think, a full picture of the considerations here.

THE COURT:  Okay.  I have a feeling that we're never going to get a full picture --

MR. SKURNIK:  Sure.

THE COURT:  -- which is part of the problem.  And so, what I'm looking -- I'm recognizing that there were serious violations here.

And I think, you know, if someone writes you a text like that or an email, your obligation under this bond is not to respond.  It's to turn -- walk away from it metaphorically.  You are not to respond.

And if you do, you can see the Government's pretty serious about this and Pre-trial Services is serious about it.  You know, so you just have to be very careful about that.

If nothing's turned up in the three months that, you know, since the January materials were provided, and what we have most recently is from the other side, that just leads me to believe that, yes, there was a violation of perhaps keeping, you know, this Defendant in custody for a month waiting for trial at the MDC is waiting to be sent back to -- well, I don't know where he would be sent, but --

MR. SKURNIK: Your Honor, if --

THE COURT: -- he's sent to North Carolina, so it could take 10 days or 20 days sometimes to do that. I don't think that needs to happen. I think he can be trusted to go down there.

MR. SKURNIK: If I can just request in that case that the Court stay the order of release for 24 hours to give the prosecution team down in North Carolina an opportunity to review the proceedings today and determine whether there's any appropriate relief they would want to see in the district court or before the magistrate down in North Carolina?

THE COURT: Uh-huh. Yes, I'll do that.

MR. SKURNIK: Okay.

THE COURT: Okay.

MR. SKURNIK: Thank you, Your Honor.

THE COURT: Because it can't hurt to get more information. So if there's more information that the prosecution has, then we'll hear it, but at this point, this is how I see it.

There's been a violation, but not one that leads me to believe that home detention wouldn't be sufficient to protect the community at this point.

MR. PADDEN: Obviously, it's not up to me, Judge. My request would be that you follow your instincts and release him now. If you want to have him come back tomorrow, we would

review, we'll come back tomorrow.

THE COURT:  I'm going to stay it for 24 hours.  I owe that to the Government because the Government has been providing information as well.

THE CLERK:  So, Judge, do I enter a temporary till tomorrow at 2:00 or 11:00?

THE COURT:  It's just being stayed.

THE CLERK:  So --

THE COURT:  So unless nothing -- unless there's an appeal filed or the Government asks to have another hearing tomorrow, does that mean bring him in?  Would you be seeking to bring him into tomorrow for a hearing?

MR. SKURNIK:  At this time, no.  I don't think so, but you know, it -- if we needed to make -- to request anymore proceedings here in this Court, I think, you know, we'd do that as soon as possible and let Your Honor know and potentially let the district court know as well.

THE COURT:  Well, you would have to -- if you were going to do that, you'd have to have him brought in for tomorrow to decide before the end of the day to do that.

THE CLERK:  I have the Marshals --

MR. PADDEN:  Yeah, no.

THE CLERK:  You have to bring him anyway, right because --

THE COURT:  We're going to release him.

THE CLERK:  -- today, if they're not feeling that he's going to be released from here, no, marshals?  So the judge is entering a bond, but he's staying it for 24 hours.  But don't we need Mr. Mann back here tomorrow either for another hearing, because they're discussing with North Carolina?

THE MARSHAL:  Okay.

THE CLERK:  So don't we need Mr. Mann back anyway tomorrow, right?

THE MARSHAL:  Right, so MDC tonight.

THE CLERK:  So we're not going to get a 475 I'm saying.  So --

THE MARSHAL:  Other than -- yes.

THE CLERK:  Right, but you need some time to hold him, so.

THE COURT:  So a temporary then?

THE CLERK:  That's what I meant.

THE COURT:  You're right, yeah.  Thank you.

THE CLERK:  I mean, I don't know, Judge.

THE COURT:  No, you're right.

THE CLERK:  I didn't know.

THE COURT:  No, you're right.  Yeah.

THE CLERK:  We're going to bring you back tomorrow.  And we'll know either way whether we're going to release him.  Judge Levy's on duty tomorrow in any event.  So he's got to be

brought back.  If you're not appealing, we're just going to release him on the bond or we'll just come back at 2:00 do you think?

THE COURT:  Okay, then we should figure out the bond now, make sure that the bond is there, because I can't stay it if it doesn't exist.

THE CLERK:  Okay, so okay.  Okay, so Judge, what's the bond?  Okay.

THE COURT:  Okay, the original bond was for how much do we know?  Was it 20,000 I think?

MS. LOPEZ:  From North Carolina, it's an ERV.

THE COURT:  Oh, really?

MS. LOPEZ:  Yeah.

THE COURT:  It was 20- from Judge Bulsara --

MS. LOPEZ:  Yeah.

THE COURT:  -- and then PRV there.  We'll make it 20- here again.

THE CLERK:  20,000, Judge?

THE COURT:  Uh-huh, yes.

THE CLERK:  Okay.  Unsecure,  Okay, and --

THE COURT:  And all the other conditions of the bond will remain the same except for home detention, is there -- can we ratchet it up a little bit?  What more can we do without him starving to death?

MS. LOPEZ:  Yeah, Your Honor, that's what I was

explaining with the home incarceration condition, he has to stay home at all times except only for medical emergencies or appearances and attorney visits. So he would not be able to work. He would not be able to go get groceries or do basic necessities.

And, again, he doesn't live or have anyone around him to do those basic necessities or --

THE COURT: Right, the people that these -- that we're worried about, if there is someone to worry about, are in North Carolina, right?

MR. PADDEN: Right.

THE COURT: They're not here. So if he went out to the deli here, he's not going to be endangering anyone if he's released. If we set up a home detention situation where he's allowed to go out and get his own food or whatever.

MS. LOPEZ: That's already what we've been working on with him for the schedule -- for the daily -- yeah.

THE COURT: And he hasn't been able to do it, right?

Okay, so Mr. Mann, if I release you with the same conditions that you had before for home detention, you got to follow them strictly.

You know, you need to get out for food, otherwise, what's going to happen is the Government's going to appeal this to -- in North Carolina and the judge in North Carolina is going to decide this. And the judge in North Carolina's going

to want to know how you've done.

THE CLERK:  Okay.

THE COURT:  And so, your record will tell him.  So it's really -- it's up to you now.  You're being given --

THE CLERK:  Set bond, Judge?

THE COURT:  Yeah.

THE CLERK:  (Indiscernible.)  If we don't hear from the Government, then we'll get the bond tomorrow, but right, yeah, sign, please.  Okay, thank you.  Stating the bond, yeah, (indiscernible) tomorrow at 2:00.

THE COURT:  We're talking 2:00 tomorrow?

MR. SKURNIK:  That works for the Government, Your Honor.

THE COURT:  Okay, yeah, by 2:00, he'll be released if nothing is set.

THE CLERK:  So we're going to hold on bond?

THE COURT:  Yes, we can hold the bond.

THE CLERK:  Yeah, so I can only-- I need you to sign this (indiscernible).

THE COURT:  Okay.

THE CLERK:  I also need them to hold him and this bond (indiscernible).

(The Judge confers with the Clerk)

THE COURT:  Okay, so Mr. Mann, do you understand what's happening?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay, you understand what the Government's planning on doing?

THE DEFENDANT:  Yeah, are you planning on filling me in?

THE COURT:  Or maybe not.  Maybe not.  So really, it depends on you at this point.  If you -- if they may give you an opportunity to prove yourself.  All right, and if you can convince them that you can be trusted, that'll make a difference.

And if doesn't happen now, and they do appeal it, and they overrule, then you'll show the next time you have the opportunity, you'll show them what you can do, okay?

Anything else from the Government?

MR. SKURNIK:  No, Your Honor, thank you.

THE COURT:  Okay.

THE CLERK:  All right, thank you.

(Proceedings concluded at 4:35 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____            April 1, 2023

Chris Hwang                          Date

Court Reporter